UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD J. DUREPO, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-30195-KAR |
| | ) | |
| EASTMAN CHEMICAL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT</u>
(Dkt. No. 26)

ROBERTSON, U.S.M.J.

Richard J. Durepo, Jr. (Plaintiff), brings this action against his former employer, Eastman

Chemical Company (Defendant or Eastman), alleging age discrimination in violation of Mass.

Gen. Laws ch. 151B, § 4(1B). Eastman has moved for summary judgment (Dkt. No. 26). The

parties have consented to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R.

Civ. P. 73. For the reasons set forth below, the court DENIES Eastman's motion.

I.    RELEVANT BACKGROUND[1]

On summary judgment, the evidence is viewed in the light most favorable to Plaintiff, the

nonmoving party. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991). Plaintiff

was born in 1953. He earned an associate's degree from Springfield Technical Community

---

[1] Unless another source is cited, the facts are drawn from Defendant's Local Rule 56.1 Statement
of Facts (DSOF) (Dkt. No. 28), Plaintiff's Response to Defendant's Local Rule 56.1 Statement of
Facts (Pl. Resp.) (Dkt. No. 32 ¶¶ 1 to 82), Plaintiff's Statement of Material Facts (PSOF) (Dkt.
No. 32 ¶¶ 83 to 145), and Defendant's Response to Plaintiff's Statement of Material Facts (Def.
Resp.) (Dkt. No. 35).

College in 1973.  In 1979, Plaintiff began working for the Monsanto Corporation (Monsanto) at its facility in the Indian Orchard section of Springfield, Massachusetts.  Between 1986 and 1989, Plaintiff assumed the position of Pilot Plant manager of Saflex Technology, a division of Monsanto that produced plasticized polyvinyl butyral interlayers for use in laminated safety glass.  Plaintiff continued working in that position after Monsanto spun off its Saflex business as a separate company, Solutia, Inc. (Solutia), in 1996 or 1997 and after Eastman acquired Solutia in 2012 (DSOF ¶¶ 1-4).

Plaintiff was 66 years old when Eastman terminated his employment on May 11, 2020. He had nine direct reports, three engineers and six technicians, who were assigned to either the Pilot Plant or the films coating development laboratory (FCDL).  As part of Eastman's Technology Division, the Pilot Plant produced small volumes of new production technology and developed a plan for that technology to be produced on a larger scale by the manufacturing plant (DSOF ¶¶ 1, 5).

A.    Succession planning

According to Eastman, the company conducted succession planning to assure business continuity when vacancies occurred in key positions through resignations, involuntary terminations, retirements, or transfers (DSOF ¶ 6).  Succession planning for a particular position did not mean that Eastman wanted a current employee to leave (DSOF ¶ 9).

Plaintiff participated in succession planning after he became a manager for Monsanto and when he worked for Solutia and Eastman (Dkt. No. 32-1 at 57-59, 61).  At Eastman, succession planning was a collaborative effort that occurred as part of an annual week-long so-called people meeting during which managers, who reported to a division director, discussed all matters related to personnel, including promotions, hiring, employee ratings, raises, and bonuses (DSOF ¶ 7;

2

Dkt. No. 32-1 at 58, 64-67).  Succession planning gave priority to critical positions like Plaintiff's to avoid a vacancy in a critical position that no one was qualified to fill (DSOF ¶ 6; Dkt. No. 32-1 at 58-59).  Participants in the succession planning process were encouraged to identify several candidates for each critical position (DSOF ¶ 8).

       B.     <u>Retirement discussions</u>

           1.    2014 to 2018

When Brian King was appointed in 2014 as Eastman's Technology Director for Advanced Interlayers, Plaintiff told King, who was his indirect supervisor at the time, that he loved his job, had no plans to retire, and intended to work for another three to five years and beyond as long as he remained in good health (DSOF ¶ 12; PSOF ¶ 85).  Plaintiff said he would give Eastman at least a year's notice before he retired (PSOF ¶ 85).  In August 2014, at King's request, Plaintiff identified four potential candidates to succeed him as the Pilot Plant manager (DSOF ¶ 11; Pl Resp. ¶ 11; Dkt. No. 32-1 at 68-69).

King became Plaintiff's direct supervisor in 2015 or 2016 (DSOF ¶ 12).  Although Plaintiff did not discuss his retirement plans with King or anyone at Eastman after his 2014 meeting with King (DSOF ¶ 14; PSOF ¶ 87), in December 2016 or January 2017, King told his supervisor that Plaintiff would retire in the next two or three years (Dkt. No. 32-2 at 46-47).  Plaintiff's 2017 annual goals planning document, which contained the objectives that King expected Plaintiff to complete in a year, instructed Plaintiff to identify and begin training his replacement by the year's end.  Plaintiff asked King to remove that goal because he had no plans to retire; King complied with Plaintiff's request (DSOF ¶ 14; PSOF ¶ 87; Def. Resp. ¶ 87).

           2.    2018 to 2020

On February 2, 2018, Linda Conaway, the human resources manager for Eastman's Technology Division, circulated a list of retirement-eligible employees to King and other directors to identify potential succession planning needs and key skills in the event of retirement. Each person on the list was assigned a score based on the sum of their age and years of service. Plaintiff's name was near the top of the list (PSOF ¶ 88).

Peter Roose replaced King in early 2019 (DSOF ¶ 20).  In February 2019, during Plaintiff's first one-on-one meeting with Roose, Roose told Plaintiff his primary goals for the year were to identify his replacement and develop a succession plan (PSOF ¶ 90; Dkt. No. 32-1 at 94-97).  Roose repeated that objective on Plaintiff's two July 2019 performance reviews (Dkt. No. 32-1 at 94; Dkt. No. 32-5 at 4; Dkt. No. 32-23 at 1).  Roose said that Plaintiff's succession plan was an area in which Plaintiff could significantly contribute to the company's progress by "act[ing] decisively/courageously" to "create a team which is capable of carrying [his] heritage and being success [sic] in the future, talent management and training is absolutely necessary" (Dkt. No. 32-23 at 1).  Plaintiff indicated that although he would not retire for about three years, he would evaluate potential candidates for the job of Pilot Plant manager and try to identify one by the year's end (Dkt. No. 32-1 at 106, 108; Dkt. No. 32-5 at 4, 5).  Plaintiff identified an Eastman employee who was working in Mexico as his potential replacement (Dkt. No. 32-1 at 98-100).  Although Plaintiff told Roose he did not intend to retire within the next three years, Roose made a July 2019 power point presentation to his organization that identified the end of 2020 as Plaintiff's target retirement date (PSOF ¶ 93; Def. Resp. ¶ 93; Dkt. No. 32-24 at 4, 5).

In the spring or summer of 2019, Laura Bustamonte became the Technology Site Leader in Indian Orchard and Plaintiff's direct supervisor (DSOF ¶ 24; Pl. Resp. ¶ 24; PSOF ¶ 91).  She

and Roose discussed Plaintiff's need to identify a successor sooner rather than later (Dkt. No. 29-3 at 18).  Plaintiff told Bustamonte he was not planning to retire (Dkt. No. 32-1 at 101-02).

When King was the Technology Director, he held monthly meetings with group leaders and a human resources representative.  Plaintiff was part of the leadership team that attended those meetings where he discussed the development and compensation of his direct reports (PSOF ¶ 99; Def. Resp. ¶ 99).  In September 2019, Roose and Bustamonte removed Plaintiff from the leadership team without telling him (PSOF ¶ 100; Def. Resp. ¶ 100).

In January 2020, Roose asked Bustamonte for a proposal for restructuring her organization, which consisted of the Pilot Plant and FCDL, headed by Plaintiff, and the Sheet and Resin Development Group, headed by John Dolezsar, who was 37 years old.  Dolezsar had an undergraduate degree in chemical engineering and an MBA.  He began working for Solutia in 2006.  Bustamonte proposed that the Sheet and Resin Development Group be divided into two separate groups, the Sheet Development Group and the Resin Development Group.  The Pilot Plant and FCDL employees would become part of the Sheet Development Group with Dolezsar as its leader.  She proposed that Plaintiff be removed as a manager and that he become an individual contributor with no supervisory responsibilities who provided technical expertise to the Sheet Development Group.  Bustamonte's proposal was shelved due to business disruptions caused by the outbreak of the pandemic in early 2020 (DSOF ¶¶ 74-79; Pl. Resp. ¶ 78; PSOF ¶¶ 142, 144).

     C.   <u>Timekeeping investigations</u>

         1.   The investigation in 2016

In 2013, Eastman had a policy that prohibited timekeeping fraud including forging or altering timekeeping records.  Managers received training about timekeeping fraud and were responsible for preventing it within their organizations (DSOF ¶ 29).

In early 2016, King directed Karoline Butler, a human resources employee, to investigate what appeared to be an excessive amount of employee overtime in the Technology Division at the Indian Orchard facility (DSOF ¶ 30; Dkt. No. 29-2 at 22).  By comparing data from the company's electronic payroll system with records showing when employees swiped their badges to enter and exit the facility gates, Butler determined that some Pilot Plant employees were paid for time when they were not at the plant (DSOF ¶ 31).

Butler purportedly discussed her findings with two Pilot Plant employees who were entitled to overtime pay when they worked more than forty hours per week.  Butler learned that Pilot Plant employees worked through their allotted lunch break and that Plaintiff allegedly permitted employees to submit overtime to compensate for missing their lunch break (DSOF ¶ 33; Dkt. No. 32-6; Dkt. No. 32-7 at 26).  Butler was unaware that the Pilot Plant's schedule required two employees to work overtime from 6:00 to 8:00 A.M. to warm up the extrusion machines before the other department employees arrived to work their regular 8:00 A.M. to 4:00 P.M. shifts (DSOF ¶ 35; PSOF ¶¶ 104, 110).  In addition, because the Pilot Plant machinery required constant monitoring, employees had to work through lunch (Dkt. No. 29-2 at 28).[2]

---

[2] Butler determined that the Pilot Plant's schedule did not comply with Federal and Massachusetts laws that required nonexempt employees to get a break from work for at least thirty minutes (Dkt. No. 29-2 at 29).  In 2016, a human resources manager in Eastman's home office in Tennessee applied to the Massachusetts Attorney General and received an exemption from the wage and hour laws.  Thereafter, the Pilot Plant employees were permitted to work through a fifteen-minute lunch period and get paid for that time (Dkt. No. 29-2 at 30; PSOF ¶ 112; Def. Resp. ¶ 112).

As to the allegation that Plaintiff permitted employees to record overtime for time they did not work, Plaintiff told Butler that, generally, he did not allow employees to get paid for an entire shift if they arrived late or left early (Dkt. No. 32-1 at 141).  However, if the employees worked on the extrusion machines all day without the fifteen-minute breaks or thirty minute lunch periods to which they were entitled, Plaintiff believed that he had discretion to allow them to leave fifteen or thirty minutes before the end of their shift without recording that period as time off on their payroll records.  He exercised that discretion about once a month (DSOF ¶ 37; Dkt. No. 32-1 at 141-42, 144, 145, 156).

According to Butler, she counseled Plaintiff to discontinue the practice of permitting employees to get paid overtime for time they did not work (DSOF ¶¶ 34, 38; Pl. Resp. ¶¶ 34, 38).  However, Plaintiff's alleged practice was not considered a disciplinary offense in 2016, there was no documentation of Butler's alleged discussion with Plaintiff, and she did not report it to either King or Conaway (PSOF ¶¶ 114, 115; Def. Resp. ¶¶ 114, 115).  According to Plaintiff, whose account is accepted as true for purposes of summary judgment, the Pilot Plant's only audit issue was that its employees had to work through lunch to keep the machines running and his discussions with Butler were limited to clearing up her confusion on that subject (PSOF ¶ 113; Dkt. No. 32-1 at 137-41).

Because the problems with timekeeping within the Technology Division in Indian Orchard were widespread and it was unclear whether and to what extent expectations about proper timekeeping had been communicated to managers and employees when Eastman acquired Solutia in 2012, Butler decided to convey Eastman's timekeeping expectations to the entire Technology Division (DSOF ¶ 39; Pl. Resp. ¶ 39).  In April 2016, she and King distributed a draft Timekeeping Notice to all managers including Plaintiff, indicating that all time worked

should be recorded completely and accurately without exception and that overtime required a supervisor's advance approval (DSOF ¶ 40).

On June 15, 2016, King sent an e-mail message to all employees of the Technology Division that conveyed Eastman's expectation that employees would accurately record the time they worked. The attached materials described what Eastman called an exception-based time reporting system. Nonexempt employees were required to report and obtain a manger's approval for any changes from their preset work schedules such as vacation, sick time, and overtime. The materials contained detailed instructions on how to use Eastman's intranet to create and edit timesheets to reflect those exceptions to work schedules (DSOF ¶ 41). King also referred to the company's policy that made timekeeping fraud an offense that was punishable by employment termination (DSOF ¶ 42). A 2018 ethics presentation to managers pointed to inaccurate timekeeping as an example of fraud (DSOF ¶ 46). After receiving King's e-mail and attachments, Plaintiff understood Eastman's expectations concerning accurate timekeeping (DSOF ¶ 43). However, he still believed that, as a manager, he had discretion occasionally to allow employees who did not get paid breaks during the day to record that they worked ten hours when they left work thirty minutes early (DSOF ¶ 44). According to Plaintiff, he was giving his employees their paid breaks at the end of their shift instead of in the middle of it (Pl. Resp. ¶ 45; Dkt. No. 32-1 at 156-57).

## 2.  The investigation during the COVID pandemic in 2020

In April 2020, Bustamonte and human resources manager Julie Dyer investigated a compensation complaint by an employee, Stephen Collins, who had been temporarily reassigned to the Pilot Plant during the pandemic (DSOF ¶¶ 47, 48). During their investigation, Bustamonte and Dyer found that Collins had recorded a significant number of overtime hours while under

8

Plaintiff's supervision.  Dyer then compared the gate records of Collins and other Pilot Plant employees to their payroll data and determined that the gate records were not consistent with the overtime the employees recorded (DSOF ¶ 48).  Because Dyer suspected timekeeping fraud, she referred the matter to Eastman's Global Business Conduct (GBC) group for further investigation and a recommendation as to whether and to what extent disciplinary action was appropriate (DSOF ¶¶ 48, 50).

The case was assigned to GBC's lead global investigator, Lane Rushing, who had investigated five to ten cases involving timekeeping practices (DSOF ¶ 49).  Rushing found significant variances between the gate records and the payroll data of Collins, Jason Gibson, and Rick Heer, three nonexempt Pilot Plant employees (DSOF ¶ 51).  Rushing found that during the three weeks between March 23 and April 9, 2020, Collins was paid for about 10 hours that he was not present in the facility.  The variances were most acute on Fridays when he was scheduled to work until 4:00 P.M., but left the building between 1:35 and 3:07 P.M.  Most of his excess hours were paid at the overtime rate (DSOF ¶ 52).  Heer's records also showed that he left before the scheduled end of his shift during the same three-week period and was paid at the overtime rate for 2.21 hours when, according to gate records, he was not at the plant (DSOF ¶ 53).  Rushing's review of Gibson's records for the past year revealed significant variances between his gate records and payroll data including compensation for three full days of work in 2019 when, according to the gate records, he was not present at the facility.  Rushing determined that Gibson was paid for approximately 85 hours that were not substantiated by his gate records (DSOF ¶ 54).

Rushing interviewed Collins, Gibson, and Plaintiff on May 7, 2020.  In response to Rushing's questions about the discrepancy between payroll data and the gate records, Collins

said that, if he finished his work, Plaintiff told him to leave early and record that he worked ten hours that day (DSOF ¶ 55).  Ultimately, Collins was given a written warning for overstating his time at work by about 10 hours during the early days of the pandemic (PSOF ¶¶ 119, 120; Def. Resp. ¶¶ 119, 120).

When Rushing interviewed Jason Gibson, although he did not recall being paid for two days in May 2019 and for New Year's Eve 2019 when, according to the gate records, he was not at the facility, he acknowledged that it probably occurred (PSOF ¶ 122; Def. Resp. ¶ 122; Dkt. No. 29-23 at 2).  Gibson allegedly indicated that, in recognition of hard work, Plaintiff frequently told employees to leave early if they had finished their work and to make sure they put in for all of their hours, including overtime, even if they did not work a full day or a full 40-hour work week (PSOF ¶ 122; Def. Resp. ¶ 122; Dkt. No. 29-23 at 1, 2).  However, during Gibson's disciplinary review – which took place after Plaintiff's employment was terminated – Gibson denied that Plaintiff was to blame for the difference between the hours he worked and the amount he was paid.  Instead, Gibson accepted full responsibility for failing to account for the time he was absent from work.  Gibson's employment was terminated after his disciplinary review (DSOF ¶ 73; PSOF ¶ 125; Def. Resp. ¶ 125).

When Rushing interviewed Plaintiff, Plaintiff told Rushing that his employees were on the honor system as to timekeeping because he was not always on-site to monitor their time.  He expected them to enter their time correctly (PSOF ¶ 108; Def. Resp. ¶ 108).  Plaintiff assumed it was Eastman's policy to allow employees to leave early in March and April 2020 if they completed their work for the day to avoid potential exposure to the COVID virus.  According to Plaintiff, "this was not a large amount of time" (DSOF ¶ 61; PSOF ¶ 116).  The only time Plaintiff told his entire team to leave and "put in for your full day in appreciation for all you've

done during COVID" was on the Thursday before Good Friday in 2020 when Plaintiff's team finished their work early (DSOF ¶ 61).

As to Collins' pay for time Collins was not present at the facility, Plaintiff explained that when Collins was moved to the Pilot Plant during the pandemic, he had work responsibilities outside of the Pilot Plant and reported to another supervisor who reviewed his payroll data (PSOF ¶ 118; Dkt. No. 29-22 at 1-2).  As to Gibson, Plaintiff said Gibson could perform some of his duties from home (PSOF ¶¶ 123, 124; Def. Resp. ¶¶ 123, 124; Dkt. No. 29-22 at 2-3), and that he told Gibson to work from home one day in late December 2019 because no other employees were at work and it was not safe for him to be there alone (PSOF ¶ 123; Def. Resp. ¶ 123).  According to Bustamonte, Plaintiff likely did not understand the extent of Gibson's overreported time because Plaintiff had approved "a little time here and there" (PSOF ¶ 122; Def. Resp. ¶ 122; Dkt. No. 32-27 at 35-36).

   D.   Plaintiff's disciplinary review and discharge

Plaintiff was not considered a target of the GBC investigation until Rushing completed interviewing Plaintiff, Collins, and Gibson on Thursday, May 7, 2020 (DSOF ¶ 63; PSOF ¶ 126; Def. Resp. ¶ 126).  After Rushing consulted with his supervisor, Rushing recommended to Dyer that Eastman terminate Plaintiff's employment (DSOF ¶ 63).  The recommendation was based on Rushing's conclusion that Plaintiff had instructed Collins and Gibson to falsify their time records, Plaintiff's purported admission that, in 2016, Butler advised him that Eastman prohibited that practice, and his responsibility for reviewing for accuracy the overtime hours of employees who reported to him (DSOF ¶ 64; PSOF ¶ 133).

After receiving GBC's recommendation, Dyer scheduled Plaintiff's disciplinary review for the morning of May 11, 2020, in front of Roose, Bustamonte, and Dyer (DSOF ¶¶ 65, 66;

PSOF ¶ 128).  Eastman's standard procedure required the review committee to provide the employee with a report that described the reason for the disciplinary review meeting.  The employee could then submit a written response to the personnel report that was read to the review committee.  After the committee asked the employee follow-up questions, the meeting adjourned so that committee members could confer and decide on the outcome before communicating their decision to the employee (DSOF ¶ 65).

Plaintiff contends that evidence shows that the termination of his employment was a foregone conclusion before the May 11, 2020, hearing was held (PSOF ¶ 129).  On May 8, 2020, Dyer notified Eastman's chief technology officer, Steve Crawford, that GBC had decided that Plaintiff should be discharged.  Crawford did not intervene to change the outcome (PSOF ¶ 129; Def. Resp. ¶ 129).  Also on May 8th, Dyer prepared talking points for Roose and Bustamonte to use in terminating Plaintiff's employment.  Dyer did not draft talking points for any other potential outcome (PSOF ¶ 130; Def. Resp. ¶ 130).  In addition, Dyer asked for assistance from the communications department in drafting a sensitive communication that the review committee would need on Monday because they had "quickly progressed through an investigation that *will* lead to the termination of a supervisor and one of his employees" (PSOF ¶ 131; Def. Resp. ¶ 131).  Bustamonte submitted her proposed new organization chart to Dyer, which eliminated Plaintiff and showed Dolezsar as the new leader of the Pilot Plant (DSOF ¶ 80; Pl. Resp. ¶ 80; PSOF ¶ 132; Def. Resp. ¶ 132).

Dyer prepared the personnel report that she read during Plaintiff's May 11th disciplinary review.  While Dyer's initial draft of the report alleged that Plaintiff had instructed his direct reports to submit false time records, she later removed that allegation.  The final personnel report stated that Plaintiff "approv[ed] unworked time for payment for his employees" (PSOF ¶ 134;

Def. Resp. ¶ 134).  Plaintiff responded by explaining that two technicians worked overtime from 6:00 A.M. to 8:00 A.M. to "heat up the [extrusion] line."  Because the employees who started the machinery arrived before him and because he attended meetings throughout the day, he did not see exactly when his employees were coming and going.  They were on the honor system as to timekeeping and he expected them to enter their time exceptions into the system.  Further, based on guidance that the Pilot Plant was running only for critical work during the pandemic and that his employees should leave when they completed their work, he sent them home if they finished their work early instead of having them gather and risk exposure to the virus (Dkt. No. 29-26 at 2).

The disciplinary committee asked Plaintiff whether he recalled speaking with Butler in 2016.  He said that he recalled explaining that Pilot Plant employees worked through their lunch hour but did not recall talking about rewarding employees with time off (Dkt. No. 32-12 at 42-43).  The review committee did not ask Plaintiff whether he directed his employees to leave early and record time they did not work (PSOF ¶ 134; Def. Resp. ¶ 134; Dkt. No. 32-16).

Roose testified that, before the hearing, he had not decided to go along with GBC's recommendation to terminate Plaintiff's employment because he wanted to hear Plaintiff's rebuttal (DSOF ¶ 68; Pl. Resp. ¶ 68).  He was disappointed that Plaintiff had not addressed all of the alleged infractions (DSOF ¶ 70; Pl. Resp. ¶ 70).

Dyer had tried to identify past incidents at Eastman that involved similar facts.  She did not find any comparator incident in which a manager had been discharged for a direct report's timekeeping violations (PSOF ¶ 141; Def. Resp. ¶ 141).  She did, however, find that a manager had been given a warning for negligently monitoring a direct report's timekeeping.  The direct report did not record her time off as sick time because she had exhausted all her sick time.  As a

result, she was paid for working 70 days that she was absent from work (DSOF ¶ 67; Pl. Resp. ¶ 67). In contrast, according to Eastman, Plaintiff participated in the alleged timekeeping fraud by instructing his subordinates to falsify their time records (DSOF ¶ 67).

The review committee notified Plaintiff that they had decided to terminate his employment (DSOF ¶ 72; Pl. Resp. ¶ 72). The committee's decision was influenced by the instruction Butler supposedly gave Plaintiff in 2016 that he should not reward employees with paid time off and Plaintiff's purported failure to display remorse or acknowledge any wrongdoing (DSOF ¶¶ 64, 67, 71; Pl. Resp. ¶¶ 64, 67, 71; PSOF ¶ 137; Def. Resp. ¶ 137).

After Plaintiff was discharged, Eastman implemented Bustamonte's January 2020 reorganization plan. Dolezsar, who was 37, assumed Plaintiff's duties as the Pilot Plant manager (DSOF ¶ 81). Employees who previously reported to Plaintiff began reporting to Dolezsar either directly or indirectly (PSOF ¶ 145; Def. Resp. ¶ 145).

## II.   LEGAL STANDARD

The purpose of summary judgment is "'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted). "Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015) (quoting Fed. R. Civ. P. 56(a), (c)). "A 'genuine' dispute is one that, based on the supporting evidence, 'a reasonable jury could resolve . . . in favor of the nonmoving party,' and a 'material' fact is one that has 'the potential to affect the outcome of the suit under the applicable law.'" *Id.* at 111-12 (alteration in original)

(quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted)).

"If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts 'that a reasonable jury could return a verdict for the nonmoving party.'" *Ruggiero,* 137 F. Supp. 3d at 112 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of material fact. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

III.   Analysis

A.  <u>Summary judgment in employment discrimination cases</u>

"Massachusetts's antidiscrimination statute forbids employers from . . . terminating employees based on their age." *Dusel v. Factory Mut Ins. Co.*, 52 F.4th 495, 502 (1ˢᵗ Cir. 2022). "Because . . . direct evidence [of discriminatory animus and causation] 'rarely exists,' . . . an employee plaintiff [asserting discrimination] may . . . survive [a summary judgment motion] by providing 'indirect or circumstantial evidence . . . using the three-stage, burden-shifting paradigm first set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973).'" *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 32 (Mass. 2016) (quoting *Sullivan v. Liberty Mut. Ins. Co.,* 825 N.E.2d 522, 530 (Mass. 2005)).

> Under this tripartite framework, a plaintiff bears the initial burden of establishing a prima facie case of age discrimination by demonstrating that he or she "[a] was a member of the class protected by [Mass. Gen. Laws ch.] 151B (that is, over forty years of age); [b] had performed [his . . .] job at an acceptable level; [c] was terminated; and [4] was replaced by a similarly or less qualified" person at least five years younger.

*Dusel,* 52 F.4th at 503 (quoting *Knight v. Avon Prods., Inc.*, 780 N.E.2d 1255, 1262, 1265 (Mass. 2003) (footnote omitted)).  "In the second stage [of the paradigm], the burden of production shifts to the employer to 'articulat[e] a legitimate, nondiscriminatory reason for its . . . decision.'" *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 50 N.E.3d 778, 793 (Mass. 2016) (quoting *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 646 N.E.2d 111, 115 (Mass. 1995)).  "At the final stage, the burden of production shifts back to the employee to produce evidence that 'the employer's articulated justification [for the adverse action] is not true but a pretext.'" *Id.* at 793 (alteration in original) (quoting *Blare,* 646 N.E.2d at 116).

"Massachusetts is a pretext only jurisdiction."  *Blare,* 646 N.E.2d at 116.  Consequently, "an employee may survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against him . . . were not the real reasons for that action,' even if that evidence does not show directly that the true reasons were, in fact, discriminatory."  *Verdrager,* 50 N.E.3d at 794 (citation omitted).  "Such indirect evidence is sufficient at the summary judgment stage because, '[c]ombined with establishment of a prima facie case . . . a showing of pretext eliminates any legitimate explanation for the adverse . . . decision and warrants,' but does not require, 'a determination that the plaintiff was the victim of unlawful discrimination.'"  *Id.* (first and second alterations in original) (quoting *Blare,* 646 N.E.2d at 117).

> While the plaintiff does bear "the burden of producing evidence" that the employer's reasons are pretextual [under the three part test], *see Matthews v. Ocean Spray Cranberries, Inc.*, 686 N.E.2d 1303[, 1308] ([Mass.] 1997) . . . , the burden of persuasion at summary judgment remains with the defendant[ ], who "as the moving part[y], 'ha[s] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [it] would not have the burden on an issue if the case were to go to trial.'"

*Bulwer,* 46 N.E.3d at 34 (quoting *Sullivan*, 825 N.E.2d at 529).

B.      Prima Facie Case

"[T]he plaintiff's initial burden of establishing a prima facie case" in asserting a claim of

employment discrimination under c. 151B "is not intended to be onerous."  *Sullivan,* 825 N.E.2d

at 534.  "It is meant to be a 'small showing' that is 'easily made.'"  *Id.* (quoting *Che v. Mass. Bay*

*Transp. Auth.,* 342 F.3d 31, 38 (1st Cir. 2003); *Kosereis v. Rhode Island,* 331 F.3d 207, 213 (1st

Cir. 2003)).  Here, it is undisputed that, at age 66, Plaintiff was a member of a protected class,

*see* Mass. Gen. Laws ch. 151B, §1(8); that, at least for purposes of summary judgement, he

performed his job at an acceptable level, *see Meléndez v. Autogermana, Inc.,* 622 F.3d 46, 51

(1st Cir. 2010); and that his employment was terminated.  As to the fourth element, while

Dolezsar was more than five years younger than Plaintiff, Eastman contends that Dolezsar did

not replace Plaintiff because Plaintiff's position was eliminated by Bustamonte's reorganization

and, in any event, Dolezsar was more qualified than Plaintiff (Dkt. No. 27 at 13-15).  The court

disagrees.

"[A] plaintiff need not demonstrate that a new employee was hired or a current employee

was formally designated as a replacement in order to satisfy the fourth prong of the prima facie

case." *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 59 (1st Cir. 2005).[3]  *See*

*Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 n.11 (1st Cir. 1979), *abrogated on other grounds by*

*Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111 (1985) ("A replacement need not be sought

from outside the company . . . nor need he be designated formally as such.").  Instead, a plaintiff

can satisfy his burden by showing that the company had a continuing need for the work that he

was performing prior to his termination.  *See Bennett v. Saint-Gobain Corp.,* 507 F.3d 23, 30 (1st

---

[3] In interpreting Mass. Gen. Laws ch. 151B, Massachusetts courts may look to the interpretations
of the antidiscrimination provisions of Title VII.  *Blare*, 646 N.E.2d at 115.

Cir. 2007) (stating, in an age discrimination case, that the plaintiff could satisfy the fourth element by showing that the "employer had a continuing need for the services that [the plaintiff] had been rendering").

A reasonable factfinder could conclude that Dolezsar assumed Plaintiff's tasks in addition to performing his duties as the leader of the Sheet and Resin Development Group. *See id*. Plaintiff was the manager of the Pilot Plant and the FCDL when his employment was terminated (DSOF ¶ 5). After Plaintiff was discharged, the group that Dolezsar supervised was divided into the Sheet Development Group and the Resin Development Group. The employees assigned to the Pilot Plant and the FCDL became part of the Sheet Development Group and reported to Dolezsar who was then responsible for managing the combined Sheet Development Group and the Pilot Plant/FCDL (DSOF ¶¶ 74-77, 81). According to Roose, Bustamonte, and Dyer, Dolezsar took over Plaintiff's duties and responsibilities as the manager of the Pilot Plant and FCDL and supervised the Sheet Development Group. Dolezsar's later delegation of some of Plaintiff's functions did not eliminate Dolezsar's ultimate responsibility for those functions (Dkt. No. 32-3 at 17; Dkt. No. 32-4 at 69-70; Dkt. No. 32-12 at 129). In view of the evidence showing that Eastman continued to need a person to supervise Plaintiff's former direct reports in the Pilot Plant and the FCDL, Plaintiff has satisfied his burden of showing that Dolezsar replaced him. *See Bennett,* 507 F.3d at 30; *Keisling v. SER-Jobs for Progress, Inc.,* 19 F.3d 755, 760 (1st Cir. 1994); *see also Blare,* 646 N.E.2d at 118 (stating that by showing that his employer "delegated his duties to various employees who were not within the protected age category," the plaintiff established the fourth element of his prima facie case).

As to Eastman's contention that Dolezsar was more qualitied than Plaintiff, "'in a discharge case – where an employee has been doing the job satisfactorily for a substantial period

of time – the proponent's burden [to demonstrate (his) qualifications] is not great.'" *Caraballo-Caraballo v. Corr. Admin.,* 892 F.3d 53, 59 (1st Cir. 2018) (second alteration in original) (quoting *Cumpiano* v. *Banco Santander P.R.*, 902 F.2d 148, 154 (1st Cir. 1990)).  "[T]he plaintiff's ability to satisfy the job qualifications element will ordinarily depend on whether []he was successfully performing [his] job at the time of [his] discharge . . . ." *Id.* at 59-60.  Plaintiff's decades of experience successfully managing the Pilot Plant and the FCDL and their employees is sufficient to satisfy his burden of showing that he and Dolezsar were similarly qualified (DSOF ¶¶ 3, 5; PSOF ¶ 109; Def. Resp. ¶ 109).  *See id.* at 60 (plaintiff's successful tenure in her position "would allow a reasonable person to conclude that [her] qualifications were similar – if not superior – to [her replacement's], despite his better educational credentials."); *see also Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 139 (1st Cir. 2012) (finding that a discharged plaintiff's long history of successful employment sufficed to establish his qualifications for the position at the prima facie stage).

The cases about employee qualifications on which Eastman relies are distinguishable.  In *Gervais v. Franklin Pub. Schs.,* Civil Action No. 09-10719-DJC, 2012 WL 988026 (D. Mass. Mar. 23, 2012), the plaintiff neither alleged nor presented evidence to show that she and her successor were similarly qualified to teach music.  *See id.* at *12.  In *Reidy v. Travelers Ins. Co.,* 928 F. Supp. 98 (D. Mass. 1996), the plaintiff failed to sufficiently allege that he was replaced by a younger person.  *Id.* at 108.  *Delva v. Brigham & Women's Hosp., Inc.,* 894 N.E.2d 606 (Mass. App. Ct. 2008), addressed the plaintiff's claim of age discrimination in hiring.  *See id.* at 608-09. The plaintiff fell short of establishing a prima facie case because he did not possess the specific job qualifications that the employer required.  *See id.* at 609-10.

Plaintiff has satisfied his burden of showing that Dolezsar took over his functions after he was discharged and, although he and Dolezsar had different backgrounds and skills, that each was qualified to perform those functions to a substantially similar degree.

C.      Pretext

The First Circuit has noted that courts should "proceed with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998)).  In Plaintiff's alleged failure to comply with Eastman's timekeeping policies by directing his subordinates to falsify their time records and encouraging them to record time they did not work, Eastman has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Consequently, the burden shifts back to Plaintiff to point to evidence on the basis of which a reasonable factfinder could conclude that Eastman's proffered reason was not the real reason for Plaintiff's discharge.  *See Verdrager,* 50 N.E. 3d at 793.

"A plaintiff can 'establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [for his termination] such that a factfinder could' rationally find them unworthy of credence and hence 'infer that the employer did not act for the asserted [nondiscriminatory reasons].'"  *Taite,* 999 F.3d at 94 (second alteration in original) (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)).  "There are many veins of circumstantial evidence that may be mined [to establish pretext as] . . . courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff."  *Mesnick,* 950 F.2d at 824.

Plaintiff has assembled an aggregate package of proof that entitles him to submit his case to a jury.  In this regard, he points to evidence of persistent efforts by his supervisors to persuade him to retire; a plan to strip him of supervisory responsibilities and allocate those responsibilities to a younger, less experienced manager; a discharge process that did not comply with Eastman's policies and procedures and in which the outcome was foreordained; and termination of employment when a similar, far costlier supervisory lapse resulted in no more than a written warning.

As to succession planning and retirement inquiries and references, "[a]n employer may legitimately inquire about an employee's plans [for retirement] so that it can prepare to meet its hiring needs[, but] repeated and/or coercive inquiries can clearly give rise to a reasonable inference of anti-age bias . . . ." *Greenberg v. Union Camp Corp.,* 48 F.3d 22, 28-29 (1st Cir. 1995).  There is evidence in the record tending to show that Plaintiff's supervisors ignored his statements that he intended to continue working and repeatedly directed him to identify and train his successor (e.g., DSOF ¶ 12; PSOF ¶ 85; PSOF ¶¶ 90, 93; Dkt. No. 32-23 at 1).  Those discussions began in 2014, when King was Plaintiff's supervisor, continued when Roose took over for King and told Plaintiff 2019 that his primary goal for the year was to name his replacement, and continued through early 2020, when Bustamonte proposed to strip Plaintiff of his supervisory responsibilities and assign those responsibilities to the much younger Dolezsar (DSOF ¶¶ 12, 14, 74-79; Pl. Resp. ¶ 78; PSOF ¶¶ 85, 90, 144; Dkt. No. 32-23 at 1).  The "[c]redibility determinations regarding pretext, motive, and intent [raised by this evidence] are properly left for trial . . . ." *Fife v. Metlife Grp., Inc.*, 411 F. Supp. 3d 149, 169 (D. Mass. 2019).

"Deviation from established policy or practice may be evidence of pretext." *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998) (citing *Lattimore v. Polaroid Corp.,* 99

F.3d 456, 466–67 (1st Cir. 1996)).  *See Dartt v. Browning–Ferris Indus., Inc. (Mass.),* 691

N.E.2d 526, 536 (Mass. 1998) (evidence that the employer deviated from normal management

procedures in summarily terminating the plaintiff's employment could support an inference of

perceived disability discrimination).  In support of his contention that the reasons given by

Eastman for his discharge were pretextual, Plaintiff further points to Eastman's alleged failure to

comply with the tenets of its disciplinary review process (Dkt. No. 32-12 at 31).

     According to Eastman, Plaintiff was discharged for directing his employees to falsify

their time records to get paid for hours they did not work (Dkt. No. 29-11 at 7), but the review

committee neither advised him that they were considering that ground nor questioned him about

it (PSOF ¶ 134; Def. Resp. ¶ 134; Dkt. No. 29-25 at 3; Dkt. No. 32-16).  Eastman's failure to

provide Plaintiff with an opportunity to respond to the most serious allegation of misconduct,

and the one for which he was discharged, could be viewed as evidence of pretext.  *See Hoch v.*

*Carpenter Tech. Corp.,* CIVIL ACTION No. 19-3220, 2021 WL 4774867, at *11 (E.D. Pa. Oct.

13, 2021), *appeal dismissed,* Nos. 21-3090 & 21-3327, 2022 WL 1504876 (3d Cir. Feb. 9, 2022)

("[defendant's] failure to go by the book in [plaintiff's] case leads us to believe that [his]

termination was a foregone conclusion" and that defendant's "proffered justification . . . was a

pretext for discrimination.").  Eastman's changing explanations for Plaintiff's discharge could

also contribute to an inference of pretext, *see Joseph v. Lincare, Inc.*, 989 F.3d 147, 160 (1st Cir.

2021) ("An employer's changing explanations for an adverse employment action can sometimes

provide evidence of pretext.") (citing *Domínguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 431-

32 (1st Cir. 2000)), as could the apparently abundant evidence that the outcome of the

disciplinary process was decided before the review committee heard from Plaintiff (DSOF ¶ 80;

Pl. Resp. ¶ 80; PSOF ¶¶ 129-32; Def. Resp. ¶¶ 129-32).  *See Lattimore,* 99 F.3d at 467 (in a

disability discrimination case, evidence from which it could be inferred that the results of plaintiff's independent medical examination were preordained was sufficient to present a jury question concerning pretext).  *See Tsavaris v. Savannah Law Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) ("If Morris made up his mind to terminate [plaintiff's employment] before observing her teaching, then his observation could not have been the basis for his decision" and would be "strong evidence" that defendant's explanation was a pretext); *Coveney v. U.S. Bank Nat'l Ass'n,* No. 1:07-cv-706, 2008 WL 4332515, at *10-11 (S.D. Ohio Sept. 17, 2008) (a manager's comment that he had made up his mind to fire plaintiff before the incident that the bank claimed was the basis for her termination was evidence of pretext).  There is also conflicting evidence on whether, as Eastman contends, Plaintiff was warned in 2016 about employee timekeeping infractions, or whether his communications at that time were limited to clarifying for Butler that employees under his supervision were unable to take the breaks to which they were entitled.  Butler neither documented her alleged discussion with Plaintiff in his personnel file nor reported the conversation to King or Conway and notes of the conversation that she claimed she took were lost or destroyed before her November 2021 deposition (PSOF ¶¶ 114, 115; Def. Resp. ¶¶ 114, 115; Dkt. No. 32-7 at 37-38).  Viewing the record in the light most favorable to Plaintiff, there is no evidence that Butler warned Plaintiff against allowing and encouraging his employees to falsify their payroll records.  *See Lipchitz v. Raytheon Co.*, 751 N.E.2d 360, 368 (Mass. 2001) ("In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind.").

Finally, "[t]he most probative means of establishing that the plaintiff's termination was a pretext . . . is to demonstrate that similarly situated [ ] employees were treated differently."

*Matthews*, 686 N.E.2d at 1309.  Plaintiff approved 10 hours that Collins did not work and about

85 hours that Gibson did not work (PSOF ¶ 134; Def. Resp. ¶ 134; Dkt. No. 29-25 at 3).

Plaintiff points to the different treatment meted out to a supervisor whose direct report falsely

recorded 70 days in the office – some 560 hours, assuming 8-hour days – that the employee did

not work (DSOF ¶ 67; Pl. Resp. ¶ 67).  Plaintiff and the comparator appear similarly situated in

that both were supervisors and there was a discrepancy between the hours their direct reports

worked and the amounts the direct reports were paid (Dkt. No. 32-12 at 44).  *See Vélez v.

Thermo King de P. R., Inc.*, 585 F.3d 441, 451 (1st Cir. 2009) ("An employer's disparate

treatment of employees in response to behavior that legitimately offends the employer can

provide evidence of discriminatory animus."); *Abramian v. President & Fellows of Harvard

Coll.,* 731 N.E.2d 1075, 1083 (Mass. 2000) (a less severe punishment for a similarly situated

person can be evidence of discriminatory animus that refutes a claim of a legitimate employment

decision).  Plaintiff contests the factual basis for Eastman's claim that Plaintiff's complicity in

timekeeping fraud by his direct reports distinguishes his situation from the situation of the

manager who approved 70 days of time not worked.

There are factual disputes between the parties and evidence based on which a jury could

find that Eastman's stated reasons for terminating Plaintiff's employment were not true.  Plaintiff

is entitled to a trial on the contested elements of his age discrimination claim.

IV.    CONCLUSION

For the above-stated reasons, Eastman's motion for summary judgment (Dkt. No. 26) is

DENIED.  The Clerk's Office is directed to schedule a status conference in this case on a date

mutually convenient for the court and the parties.

It is so ordered.

Date:  January 23, 2023                              /s/ Katherine A. Robertson
                                                     KATHERINE A. ROBERTSON
                                                     United States Magistrate Judge